IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JAKE C. PELT, ET AL., FOR THEMSELVES AND FOR AND ON BEHALF OF A CLASS OF PERSONS consisting of all Navajo Indians residing in San Juan County, Utah, including a sub-class of persons consisting of all other Indians the Secretary of Interior saw fit to settle on lands described in the 1933 Act [47 Stat. 1418] prior to May 17, 1968,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE OF UTAH,<br><br>Defendant. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br><br><br>Case No. 2:92-CV-639-TC |

Beneficiaries of the Navajo Trust Fund filed this class action against the Fund trustee, Defendant State of Utah, seeking relief for alleged mismanagement of Fund monies. They seek, among other things, a fiduciary accounting of money spent from the Fund. Currently, the court is faced primarily with the issue of what constitutes an adequate accounting by the State. In resolving the issue, the court addresses the State's request for reconsideration of the court's June 19, 2001 Order defining accounting burdens and procedures.

Having reviewed Indian accounting case law, the parties' original and supplemental pleadings regarding accounting burdens, and the court's June 19, 2001 Order defining accounting burdens and procedures, the court now issues this order clarifying the parties' burdens and the

proper scope and content of such accounting (e.g., by answering the question of whether the State must "key" Utah Navajo Development Council (UNDC) expenditures to supporting documentation).[1]

In sum, the court holds that its June 2001 Order (which relied on the accounting approach articulated in <u>Minnesota Chippewa Tribe v. United States</u>, 14 Cl. Ct. 116 (1987)) remains the standard in this case for the entirety of the State's accounting.  But the court clarifies the rules set forth in the June 2001 Order so as to provide the State with more guidance on how to present an adequate accounting.

**PROCEDURAL BACKGROUND**[2]

On June 19, 2001, the court held that the parties in this case must follow the accounting burdens and procedures set forth in <u>Minnesota Chippewa Tribe v. United States</u>, 14 Cl. Ct. 116 (1987).  (<u>See</u> June 19, 2001 Order (Dkt # 778), hereinafter "2001 Order.")[3]  That is the order the State has asked the court to reconsider.

In 2006, the court addressed the issue of whether the State had to account not only for its own expenditures of trust fund money but also for the expenditures of the Utah Navajo Development Council (UNDC) and its predecessors, that received blocks of money from the

---

[1]The State also requested that the court reconsider the March 31, 1999 Order and Memorandum Decision denying the State's affirmative defenses of laches and statute of limitations bar.  For reasons set forth at the end of this Order, the court defers on that issue until further briefing has occurred.

[2]The nature and history of the Fund and Plaintiffs' claims are set forth in previous orders and will not be discussed here unless necessary to explain the order.

[3]The June 2001 Order was slightly, but not substantively, modified by the court's July 18, 2001 Order addressing the State's motion for revision of the order.  (<u>See</u> Docket Entry Number 792 at p. 2 (striking the phrase "The parties in this case agree that").)

2

Fund.  During a June 9, 2006 hearing, the parties discussed whether the State's earlier accounting

of trust funds it paid to the UNDC (assuming it had a duty to account for the UNDC) was

adequate.  The Plaintiffs argued that what the State had provided was not detailed in the manner

a fiduciary accounting should be.  The State then voiced equitable concerns about the prejudicial

effect the court's 2001 Order and 1999 Order would have on the State if it had to account for

years of UNDC expenditures to the level of detail the Plaintiffs sought (the UNDC accounting

could extend back as far as the 1950s).[4]  (See June 9, 2006 Hearing Tr. at 8-9, 11, 16-18, 21, 24-

25, 27.)  At that point, and in light of the relatively recent Indian accounting decision in Cobell v.

Norton, 428 F.3d 1070 (D.C. Cir. 2005), the court directed the parties to submit simultaneous

briefs addressing (1) the issue of whether the court's 2001 Order regarding accounting burdens

and procedures should be reconsidered and modified in light of the equitable concerns voiced by

the State and the holding in Cobell; and (2) the State's request that the court reconsider its 1999

Order rejecting the State's statute of limitations and laches defenses.

In the meantime, on July 5, 2006, the court held that the State was required to account for

expenditures of trust fund monies by UNDC and its predecessors and/or related entities such as

the San Juan Resource Development Council (SJRDC) and Utah Navajo Industries (UNI).  (See

---

[4]The Plaintiffs seek an accounting for the period of years beginning at least in 1959 (when
the Fund apparently began receiving income from oil and gas royalties) and ending in 1992,
when the complaint was filed.  In April 2006, the court issued an order holding that Plaintiffs'
claims for the early years were not precluded by judgment in three earlier cases addressing
beneficiaries' requests for accounting and allegations of Fund mismanagement.  (See Apr. 27,
2006 Amended Order and Memorandum Decision (Docket Entry Number 1043).)  That order is
currently on interlocutory appeal to the Tenth Circuit Court of Appeals.  The court, however, is
proceeding on other issues concerning the accounting, because all agree that, regardless of how
the Tenth Circuit rules, the State has an obligation to account for the later years.

July 5, 2006 Order (Dkt # 1056), hereinafter the "2006 Order.")  That ruling essentially expanded what the State asserted was its accounting burden, and it brought the State's equitable concerns about the scope of its accounting obligation back to the forefront.

After a Fall 2006 meeting with the parties about the nature and content of hundreds of banker boxes containing UNDC records, the State committed to organizing the boxes in anticipation of its accounting for UNDC expenditures.  During a June 26, 2007 status conference, the parties once again discussed the issue of what constitutes an adequate accounting and the State re-voiced its equitable concerns.  To avoid the legal deadlock between the parties, the court promised the parties an order finally resolving the issues identified in the parties' simultaneous briefs regarding accounting burdens and whether the court should reconsider its 2001 Order. This is that order.

## ACCOUNTING BURDENS AND THE 2001 ORDER

### The 2001 Order

In the 2001 Order, the court held that the approach set forth in <u>Minnesota Chippewa Tribe v. United States</u>, 14 Cl. Ct. 116 (1987), would govern the general accounting in this case.  (2001 Order at 4.)  In <u>Minnesota Chippewa</u>, the court approvingly quoted <u>Blackfeet & Gros Ventre Tribes of Indians v. United States</u>, 32 Ind. Cl. Comm. 65 (1973):

> "The burden is on the defendant to make a proper accounting.  Thus, for a particular item to be exceptionable, the test is not whether the report shows it to be improper; it is enough if the report <u>fails affirmatively to show that it was proper</u>.  When the plaintiff makes this exception, it then becomes incumbent upon the Government to satisfy the Commission as to the legality of the challenged item."

<u>Minnesota Chippewa</u>, 14 Cl. Ct. at 121 (quoting <u>Blackfeet</u>, 32 Ind. Cl. Comm. at 85) (emphasis

4

added).

As summarized in a subsequent case regarding burdens in Indian trust accounting cases,

the <u>Minnesota Chippewa</u> court required the accounting trustee

> to <u>key items to vouchers and supporting documentation</u>, including the archival
> materials such as authorities, workpapers, and correspondence.  These analyses
> were presented to the tribe, thereby enabling the tribe to form exceptions.
> Following the presentation by the defendant, the accounting was assigned a
> presumption of regularity, and the tribe was charged with the burden of
> demonstrating that challenged items were disallowable.

<u>White Mountain Apache Tribe of Arizona v. United States</u>, 26 Cl. Ct. 446, 449 (1992)

(summarizing <u>Minnesota Chippewa</u> approach) (emphasis added).  For the case here, this court

held:

> In order to meet its burden of rendering a proper accounting, <u>each expenditure</u> in
> Utah's accounting report, in addition to including identifying factors such as date,
> payee, amount, and purpose, <u>must also make reference to supporting</u>
> <u>documentation</u> which would enable the Plaintiffs to readily ascertain that the
> expenditure was made in furtherance of the trust.  Although this supporting
> documentation will typically take the form of vouchers, receipts, checks,
> workpapers, meeting minutes, correspondence, or internal agency memoranda, it
> may also be in other forms such as witness affidavits or even testimony.

(2001 Order at 4 (emphasis added).)  Then the 2001 Order continued:

> After Utah produces its accounting, Plaintiffs must then form [their] exceptions,
> listing the expenditures for which Plaintiffs feel that Utah has breached its duty to
> oversee and carry out the purpose of the trust.  Plaintiffs' exceptions will fall into
> two broad categories: (1) expenditures for which Utah has violated its duty to
> account (e.g. no supporting documentation, or supporting documentation is not
> sufficient to show the purpose of the expenditure, etc.); and (2) expenditures for
> which Utah has violated its fiduciary duty (e.g. documentation suggests that
> expenditure did not benefit members of the beneficiary class, etc.).

(<u>Id.</u> at 5.)  The court required evidence from the Plaintiffs for any exceptions falling into the

second category.  (<u>Id.</u> at 7.)  The court further held that, "[s]hould the court find that Utah has not

produced 'sufficient information for the beneficiary to readily ascertain whether the trust has been faithfully carried out' with regard to certain expenditures, [Blackfeet & Gros Ventre Tribes of Indians v. United States, 32 Ind. Cl. Comm. 65, 87 (1973)], Utah will be held to have violated its duty to account for those expenditures."  (Id. at 6.)

**The State's Accounting To Date**

The accounting the State has provided to date consists essentially of three sets of documents.

First, on December 20, 1999, Utah filed its "Initial Accounting" (Dkt # 612) (consisting of twenty-four three-ring binders with a set of documents for each fiscal year (ending June 30) from 1960 to 1992).

Second, on August 29, 2000, Utah filed its "Supplemental Accounting" (Dkt #s 677, 680-95) (consisting of sixteen three-ring binders with a variety of documents in them).  According to Utah, the Supplemental Accounting

> includes and incorporates into Utah's accounting: a) revised accounting financial statements for UDIA's receipt and expenditure of 1933 Act Royalties, b) supplemental supporting records used in the preparation of those revisions; c) prior judicial accountings of 1933 Act Royalties filed by Utah in the actions [of Sakezzie and Bigman]; d) the 1991 Utah State Legislative Auditors' Report, e) independent, certified audited financial statements of [UNDC and UNI] and other recipients of Royalty Fund monies; f) the unaudited annual reports of UNDC, UNI and other recipients; g) Utah's Amended Answers to Interrogatories dated February 2000 (containing a historical narrative of the creation and management of UNDC and UNI and their decision to undertake economic development programs; and h) copies of the Utah Indian Affairs Commission's and Utah Board of Indian Affairs' ("UBIA") official meeting minute books.  Utah also includes . . . one copy of UBIA's annual reports served on the United States Department of the Interior, as required by 82 Stat. 121, and one copy of UBIA's annual reports served on the Utah State Legislature and/or the Utah Governor as required by state law. . . .

6

(Notice That Utah Has Filed a Supplemental Accounting of 1933 Act Royalties for FY1959

Through FY1992 (Dkt # 677) at 2-4.)

Third, Utah apparently supplied the Plaintiffs (but not the court) with "documents and

records to which Plaintiffs and Plaintiffs' counsel have had access through discovery

requests . . . ."  (Id. at 4.)  Plaintiffs describe the documents and records as "hundreds of boxes of

supporting documentation . . . ."  (Pls.' Supplemental Mem. Re: Accounting Procedures (Dkt #

1053) [hereinafter "Pls.' Supp. Br."] at 8.)  In Utah's Notice of the filing of its Supplemental

Accounting, Utah "deem[ed those] documents and records . . . to be a part of Utah's accounting

and are incorporated into the Initial and Supplemental Accountings by this reference."  (Notice of

Supplemental Accounting at 4.)

**Response to the State's Concerns**

The State contends that its current accounting is adequate and that the State should not be

required to "key" expenditures to documentation in the record, as the Plaintiffs insist.  Inherent in

the State's narrow view of its accounting obligation is the implicit assumption that the State is

not obliged to demonstrate the "why" (or purpose) of an expenditure.  Rather, the State suggests

that the Plaintiffs must now go through the many binders and hundreds of boxes of material

incorporated by reference into the State's accounting (that is, Plaintiffs must "find and match

checks, receipts, vouchers, etc., to the reports that have already been given") to establish their

exceptions to expenditures.  (See Def.'s Supplemental Br. Re: Scope of Duty to Account for

Royalty Fund Moneys Spent by UNDC (Dkt # 1049) [hereinafter "Def.'s Supp. Br."] at 12.)

Plaintiffs, on the other hand, contend that "Utah must provide a supplemental accounting

for activities of UNDC and UNI because yearly financial statements, audit letters, and unguided

7

access to source documents do not satisfy [the accounting standards that were established many years ago by the common law of trusts]." (Pls.' Supp. Br. at 2.)  Plaintiffs say it would be unfair to excuse the State from its duty to key expense items to supporting documentation.  According to the Plaintiffs, if the court adopted the State's position,

> the Beneficiaries will be saddled with the burden of sorting through years of unorganized and incomplete documentation to attempt to reconstruct records that the trustee should have maintained all along.  Because the trustee failed to fulfill its duty to keep accurate and organized records [and] caused the difficulty in preparing the accounting requested here, the trustee, not the Beneficiaries, should suffer the ramifications of that failure.

(Id. at 8.)

The State unpersuasively relies on, among other things, Cobell v. Norton, 428 F.3d 1070 (D.C. Cir. 2005), White Mountain Apache Tribe of Arizona v. United States, 26 Cl. Ct. 446 (1992), and Blackfeet & Gros Ventre Tribes of Indians v. United States, 32 Ind. Cl. Comm. 65 (1973), to suggest that it has already produced an adequate accounting and should not be required to wade through the hundreds of boxes containing UNDC documents.  Although the court originally raised the issue of whether the equitable remedy (statistical sampling) adopted in Cobell should be adopted here, the court now considers Cobell to be distinguishable.  The accounting in Cobell was of a magnitude not existing in this case.  It involved an historic accounting for transactions occurring as early as 1887, approximately 300,000 direct beneficiaries, hundreds of thousands of individual Indian trust accounts, $13 billion dollars in trust money, and an accounting estimated to cost $12-13 billion dollars to fully perform.  Cobell, 428 F.3d at 1072-73; Cobell v. Babbitt, 30 F. Supp. 2d 24, 28 (D.D.C. 1998).  Here, the accounting involves a single trust fund, transactions that potentially go as far back as the mid-

8

1950s, approximately 7,000-8,000 indirect beneficiaries, and (according to the Plaintiffs) approximately $50-62 million dollars in income.  (See Pls.' Verified Compl. ¶ 27; Pls.' Supp. Br. at 16; Aff. of Jim R. Parris (CPA) (Dkt # 1052) ¶¶ 19-25.)  And there has been no suggestion (much less evidence) of the need for a statistical sampling in lieu of a full accounting.  Moreover, Cobell still required documentation by the government at the initial accounting stage (a requirement the State is attempting to avoid).  Cobell, 428 F.3d at 1077.

White Mountain is distinguishable because the accounting procedure agreed upon by the parties in that case differed from the one this court has adopted, so principles articulated by that court with respect to adequacy of an accounting are inapposite.  See 26 Cl. Ct. at 449-50. Similarly, Blackfeet is inapposite because it too allowed an accounting procedure that this court has declined to follow for the reasons set forth in this order.  See id.; Blackfeet, 32 Ind. Cl. Comm. at 68.

Now the State, in further defense of its position, seeks a modification of the 2001 Order for a number of reasons.[5]

Initially, the State contends that because Minnesota Chippewa was issued in 1987, it would not be equitable to apply the "keying" requirement to accounting for years before 1987 (the State's accounting obligation could extend back to transactions that occurred in the 1950s). The State characterizes the Minnesota Chippewa standard as a new, or expanded, obligation that the State could not have known, understood or applied during the early years of its Fund

---

[5]This is the State's second unsuccessful request to the court to reconsider its 2001 Order. (See July 18, 2001 Order (Dkt # 792) (denying Defendant's request to reconsider June 2001 Order).)  In its most recent request, the State has recycled some of the arguments the court rejected earlier.  (See id.; Def.'s Supp. Br. at 2-12.)

management and record keeping.  Consequently, the State contends, it would be inequitable to

require the State to reconstruct years of financial transactions from archival records kept by

UNDC and presented to the State in hundreds of randomly organized banker boxes.[6]

Contrary to the State's contention, Minnesota Chippewa does not present a new standard

in fiduciary accounting burdens.  Its standard derives from common law trust accounting

principles that have been around for years.  Generally speaking, "[t]he trustee is under a duty to

keep accounts showing in detail the nature and amount of the trust property and the

administration thereof."  Restatement (First) of Trusts § 172 cmt. a (1935); see also, e.g., id.

§ 172 (titled "Duty to Keep And Render Accounts," the section provides that the "trustee is under

a duty to the beneficiary to keep and render clear and accurate accounts with respect to the

administration of the trust."); Restatement (Second) of Trusts § 172 (1959) (same) (quoted in

Navajo Tribe of Indians v. United States, 624 F.2d 981, 989 (Ct. Cl. 1980)).

Those established common law trust accounting principles apply in this case, and the

---

[6]The State also contends that its relationship to the Indian beneficiaries is different than
the federal government's, so accounting principles set forth in federal Indian accounting cases,
such as Minnesota Chippewa, do not apply here.  The court disagrees that the federal Indian
accounting cases are inapplicable.  Although the State does not have an inherent fiduciary
relationship with the beneficiaries, it has a statutory trust relationship, just as the federal
government did in many of the Indian trust cases.  And, apparently, the State at one point in this
case actually disagreed with the proposition it presents now.  In 1998, the State asserted that the
court should "adopt the procedure used in federal Indian accounting cases to frame the
issues . . . ."  (Utah's Mem. Supp. Mot. for J. on Pleadings at 8 (Dkt # 383).)  Later, in 2001, the
State analogized the situation in the federal Indian trust case, United States v. Mitchell, 463 U.S.
206 (1983) (noting that statute and regulations established the contours of the United States'
fiduciary responsibilities to the Indians), to the State's fiduciary responsibilities to the
beneficiaries as defined by the 1933 Act and its 1968 Amendment.  (See Utah's Mem. Supp.
Cross-Mot. Summ. J. on Acctg. Burden of Proof and Proc. (Dkt # 733) at 7.)  Also, the State
conceded that it prepared its initial accounting with Minnesota Chippewa in mind.  (2001 Order
at 4.)

State cannot rely on the defense of surprise.  Cases going back to the 1950s make the State's obligation clear.  See, e.g., Chisholm v. House, 183 F.2d 698, 703 (10th Cir. 1950) ("[T]he duty rested upon the trustees to account, and the burden was upon them or their sureties to establish the correctness thereof; to disclose fully and fairly the nature of each and every challenged transaction, and to satisfy the court that the administration of the trust was in accordance with the provisions of the trust instrument and the honor and integrity of a fiduciary.");  Sakezzie v. Utah State Indian Affairs Comm'n, 215 F. Supp. 12, 18-19 (D. Utah 1963) ("Sakezzie II") (holding that Utah officials "have an affirmative duty. . . to make reasonably available to the plaintiffs adequate information concerning the administration of the trust . . . .  [I]t is no answer to say that the information could be ferreted out from their records by the plaintiffs.") (emphasis added); Blackfeet & Gros Ventre Tribes of Indians v. United States, 32 Ind. Cl. Comm. 65, 85 (1973) ("The burden is on the defendant to make a proper accounting.  Thus for a particular item to be exceptionable, the test is not whether the report shows it to be improper; it is enough if the report fails affirmatively to show that it was proper.") (internal citations omitted; emphasis added);  In re Johnson, 518 F.2d 246, 253 (10th Cir. 1975) ("[T]he burden was on the trustee to justify his account and to show the propriety of his expenditure.");  American Indians Residing on the Maricopa-Ak Chin Reservation v. United States, 667 F.2d 980, 990 (Ct. Cl. 1981) ("Where a trust relationship between Indians and the Government is established, the Government's actions normally are judged according to standards established in traditional trust law doctrine.  The standard of duty as trustee for Indians is not mere reasonableness, but the highest fiduciary standards.").  The State cannot fairly argue that it should not be held to a standard that has been articulated for many years.

11

The State's equity argument stems from its concern that UNDC records are not in a condition that makes a proper accounting easy to accomplish.  But the State had the opportunity to control the record keeping from the beginning.  To the extent there were shortcomings in the record keeping, that is not a reason to change the accounting standard.  Indeed, the common law recognizes that difficulties of such shortcomings must be borne by the trustee.  See, e.g., American Indians Residing on the Maricopa-Ak Chin Reservation, 667 F.2d at 1004-05 ("There has been a failure to keep adequate records and the record-keeping deficiencies have been compounded by insufficient manpower available to work on this and other claims brought by other Indian tribes. . . . [The defendant must] suffer the consequences of its inadequate record-keeping and incomplete accounting . . . .") (emphasis added);  Restatement (Third) of Trusts § 83 cmt. a(1) (2007) ("*Consequences of failure to maintain records.*  A trustee who fails to keep proper records is liable for any loss or expense from that failure.") (emphasis in original).

The State also contends that the 1968 federal statute (which amended the 1933 Act creating the trust and which set forth an annual report requirement for the State), is the final word on the scope of the State's accounting obligation.  That statute reads in relevant part as follows:

> An annual report of its accounts, operations, and recommendations concerning the funds received hereunder shall be made by the State of Utah, through its duly authorized officers, commissions, or agencies, to the Secretary of the Interior and to the Area Director of the Bureau of Indian Affairs for the information of said beneficiaries.

82 Stat. 121 (1968) (amending 47 Stat. 1418 (1933)).  The State emphasizes the Tenth Circuit statement that the 1968 Amendment "partially codified [Sakezzie v. Utah Indian Affairs Comm'n, 198 F. Supp. 218, 226 (D. Utah 1961) ("Sakezzie I")] by requiring Utah's yearly submission of a report for the information of the beneficiaries."  Pelt v. Utah, 104 F.3d 1534,

1544 (10th Cir. 1996).  So, according to the State, "[n]o additional accounting requirement, other than an annual report, was required by the statute itself and the Tenth Circuit Court of Appeals, in its review of the statute, describes no accounting requirement beyond 'the yearly submission of a report for the information of the beneficiaries.'  Utah reasonably interpreted the statute as requiring no more than the annual report expressly described in the statute."  (Def.'s Supp. Br. at 4.)

> The State raised this very argument in its earlier motion to reconsider the 2001 Order.  The court rejected the argument then, and does the same now.  (See July 18, 2001 Order (Dkt # 792) at 3-4.)

> > While the 1933 Act does, as a general matter, govern the trust relationship between the parties, the court finds that the 1933 Act does not address the specific burdens and procedures currently at issue before the court.  The silence of the 1933 Act on specific accounting procedures simply reinforces the notion that traditional trust principles regarding accounting – derived from the Indian accounting cases and more generally from the common law of trusts – should be applied, insofar as these principles do not contradict the express language of the 1933 Act.  The 1968 Amendment to the 1933 Act did not intend to eliminate the applicability of trust standards and procedures to the Navajo Trust, but merely added the requirement of an annual report.

(Id.)  As noted in the 2001 Order, "[w]hen Congress establishes a trust relationship, the courts should infer, unless the statute directs otherwise, that the trust relationship will be governed by the common law of trusts."  (2001 Order at 2 (internal citations omitted).)  The 1968 Statute may have "partially codified" the holding in Sakezzie I, but it does not preclude an accounting based on traditional trust accounting principles.  Federal statutes passed to protect Indian interests must be liberally construed in favor of the Indians, with doubts resolved in their favor.  Blackfeet Tribe of Indians, 471 U.S. at 766.  The State's interpretation of the 1968 Amendment is not

13

reasonable.[7]

Third, the State, in its supplemental brief regarding accounting burdens, analogizes UNDC to "ABC Construction Company" in a hypothetical situation written to suggest that the court's rulings regarding the State's obligation to account for UNDC transactions would not be appropriate or fair.  (See Def.'s Supp. Br. at 2-3.)  In the State's hypothetical, the State hires ABC Construction Company to repair houses owned by beneficiaries.

The State's analogy in its hypothetical—in which it compares its obligation to account for UNDC expenditures to an obligation to account for ABC Construction Company's expenditures—is not persuasive.  UNDC and ABC Construction Company are not in the same position.

UNDC (through its predecessors, the Navajo Advisory Committee (NAC) and the San Juan Resource Development Council (SJRDC)) was formed by or at the behest of the State of Utah's Division of Indian Affairs[8] (a state entity) for the distinct purpose of spending Navajo

_____

[7]The court disagrees with the State's assertion that it is entitled to the same deference courts apply to federal agencies' statutory interpretations.  No special deference is owed the State in its interpretation of the 1933 Act or 1968 Act.  In Montana v. Blackfeet Tribe of Indians, the U.S. Supreme Court commented that the State of Montana "fail[ed] to appreciate . . . that the standard principles of statutory construction do not have their usual force in cases involving Indian law."  471 U.S. 759, 766 (1985).  See also Cobell v. Norton, 428 F.3d 1070, 1074 (D.C. Cir. 2005) ("the availability of common law trust precepts [in addressing Indian trust issues] complicates the application of conventional deference principles to [the Department of Interior's] interpretations of [the statute in question].") Even if the court were to give deference to the State's interpretation of the 1968 statute, the State would not prevail because its interpretation is not reasonable.

[8]Over the years, the state entity administering the Fund changed names.  Generally, it evolved from the Utah Indian Affairs Commission (1959-1967), to the Utah Board of Indian Affairs and/or the Utah Division of Indian Affairs (1967-1992).  See Utah Code Ann. § 63-22-1 et seq. (1959); § 63-36-1 et seq. (1967); § 63-36-1 et seq. (1991); § 63-88-101 et seq. (2006).

Trust Fund money.  (See, e.g., July 1, 1971 Agreement between Utah Division of Indian Affairs and UNDC (Ex. 88 to Dkt # 566) ("In 1969, the [Utah Indian Affairs Board] caused to be formed a Navajo Advisory Committee, composed of representatives of each political subdivision of Navajo society in San Juan County, Utah, to advise the Utah Indian Affairs Board . . . on Indian reaction to proposals for expenditures out of the Navajo Fund.  The committee became the board of directors of San Juan Resource Development Council which changed its name to Utah Navajo Development Council and is the entity here contracting.").)  (See also, e.g., Art. of Incorp. of UNDC (Nov. 1971) (Ex. 101 to Dkt # 566) ("The purposes for which the [UNDC] is organized are as follows: . . . (b) to act, within the limits of the authority granted to it by the Utah Indian Affairs Board, as an advisory committee to the said board and as an agency through which the said board may effectively communicate with the Indian population of San Juan County, Utah, (c) to assume the obligations of San Juan Resource Development Council . . . under existing contracts with the Utah Indian Affairs Board and Division . . . ."); June 1970 Agreement (unsigned) between Utah Division of Indian Affairs Board and SJRDC (Ex. 39 to Dkt # 566) ("Council will establish and maintain an office in Blanding, Utah which shall be designated as the 'Utah Division of Indian Affairs' San Juan office . . . .; Council will employ, as its director, Cleal Bradford or such other person as Board shall approve. . . .  Council's director will attend [meetings concerning, e.g., the Navajo Reservation] and said director shall participate in such meetings as Board's representative . . . [and] will be authorized to use the title of Associate Director of the Utah Division of Indian Affairs when so engaged.").)

     And the State maintained a certain amount of authority and control over the UNDC. (See, e.g., 1971 Art. of Incorp. of UNDC, supra.  See also Sept. 1983 Agreement between Utah

Board of Indian Affairs and UNDC at ¶ 6 ("Council will expend and account for expenditures of the Trust Fund strictly in accordance with budgeting, expenditure and accounting procedures approved by the Board.") (Ex. 124 to Dkt # 566); 1984 Agreement (not fully signed) between UBIA and UNDC at ¶ 6 (same) (Ex. 128 to Dkt # 567).)  The situation involving the State and UNDC (and its predecessors) is distinct from contracting with an independent third-party construction company such as the one described in the State's hypothetical.  Accordingly, the equitable questions raised are inapposite.

For the foregoing reasons, the court declines to modify its 2001 Order holding that the standard articulated in Minnesota Chippewa applies to the State's entire accounting.  But to assist the parties as they engage in the accounting process, the following discussion attempts to elaborate on the standard set forth in the 2001 Order, thereby providing some guidance on what constitutes an adequate accounting and what the parties are obligated to do.

**Burdens, Presumptions, and Procedures**

It is settled that the State, as trustee, has the duty to account to the beneficiaries in this case.  In a case such as this where plaintiffs have requested an accounting in the litigation context, the accounting procedure consists of three steps.  First, the State must produce an accounting according to the standards set forth in Minnesota Chippewa.  Then the Plaintiffs must present exceptions to any transaction they choose to challenge.  And, finally, the State may present a rebuttal to each of the exceptions.  Minnesota Chippewa, 14 Cl. Ct. at 121-22; American Indians Residing on the Maricopa-Ak Chin Reservation, 667 F.2d at 1002; Blackfeet, 32 Ind. Cl. Comm. at 85.  (See also 2001 Order at 4-7.)  Once the accounting procedure is complete, the issues identified during the accounting will be resolved by the court in a trial or

16

summary judgment context.  The court will not rule that the accounting as a whole is adequate or not.  Rather, the court will assess the adequacy of the accounting on a transaction by transaction basis, as expenditures are challenged through Plaintiffs' exceptions.

Ultimately, the State bears the burden of persuasion when it comes to a fiduciary accounting.  <u>Red Lake Band v. United States</u>, 17 Cl. Ct. 362, 369, 405 (1989);  <u>Minnesota Chippewa</u>, 14 Cl. Ct. at 120, 125 ("The ultimate burden of proving the allowability of a disbursement is on the defendant.");[9]  <u>White Mountain</u>, 26 Cl. Ct. at 449.  This ultimate burden does not mean that the State must point out alleged improprieties.  <u>Blackfeet</u>, 32 Ind. Cl. Comm. at 85 ("The plaintiff certainly has no right to demand that the defendant point out to him which of the listed disbursements was illegal.").  But the State must affirmatively show that disbursements were proper.  <u>Id.</u> ("[F]or a particular item to be exceptionable, the test is not whether the report shows it to be improper; it is enough if the report <u>fails affirmatively to show that it was proper</u>.").

### 1.      The First Step: The State's Accounting – What is Adequate?

During the first step in the process articulated in <u>Minnesota Chippewa</u>, the State has the initial burden of "establishing the propriety of the [fund] disbursements."  <u>White Mountain</u>, 26 Cl. Ct. at 449.  To determine whether the State has adequately accounted for the disbursements, the principal question to ask is whether the State has "established by a preponderance of evidence the fact that the money was spent for the asserted purpose."  <u>Red Lake Band</u>, 17 Cl. Ct. at  407.

---

[9]Indeed, the <u>Minnesota Chippewa</u> court, whose opinion this court follows, rejected the government's assertion that the burden of making a proper disbursement accounting did not fall on it until after the plaintiff had made a prima facie case through a preponderance of the evidence that an expenditure was improper.  14 Cl. Ct. 116, 120-21 (1987) (holding that, although the burden of proof generally rests with a plaintiff, such general proposition does not apply to matters where the government is accounting for disbursements of Indian trust funds).

See also Blackfeet, 34 Ind. Cl. Comm. at 144 ("The defendant's duty in accounting cases is to reveal what it did with the plaintiff's money"), quoted in Minnesota Chippewa, 14 Cl. Ct. at 121. The answer will be "yes" if "the trustee's [accounting] report . . . contain[s] sufficient information for the beneficiary to readily ascertain whether the trust has been faithfully carried out." Blackfeet, 32 Ind. Cl. Comm. at 87 (emphasis added).   So what does "readily ascertain" mean?

First, it means that the State must demonstrate not only how the money was spent (the "what") but also the purpose for the expenditure (the "why").  See, e.g., Red Lake Band, 17 Cl. Ct. at 369-70 (holding that "accounting claims turn on an examination of documents in order to evaluate purpose, proof, authorization, etc.") (emphasis added); American Indians Residing on the Maricopa-Ak Chin Reservation, 667 F.2d at 1001 (finding defendant's accounting "wholly inadequate" because the documentation the defendant produced was "incomplete, inconsistent, and insufficient to enable the Indians to ascertain whether defendant's obligations as a fiduciary have been faithfully discharged") (emphasis added);  Minnesota Chippewa, 14 Cl. Ct. at 122 (holding that defendant has "the initial and final obligation . . . to demonstrate the propriety of the disbursements");  Blackfeet, 32 Ind. Cl. Comm. at 85 (finding government's accounting report containing annual disbursement schedules with statements regarding "the purposes of the expenditure" satisfactory at initial stage of accounting process).

Logically, the State cannot demonstrate the propriety of the disbursement without first demonstrating the purpose of the disbursement.  For example (however simplistic it may be), if UNDC issued a check to John Doe for $5,000, and the State produces documentation showing that the check was indeed issued and cashed, the plaintiffs could not readily ascertain whether the

trust was faithfully carried out absent some documentation showing the reason why John Doe received the money.  If the State proves, by a preponderance of the evidence, the reason for the disbursement and the fact that the disbursed money actually went for that purpose, then it would be up to the Plaintiffs to show that the disbursement was improper on its face or that the record contains evidence showing that the money was not actually used for the proffered purpose.

Second, Plaintiffs can "readily ascertain" whether the trust was carried out for the stated purpose when the State has "keyed" the expenditures to supporting documentation in the record. This first requires the State to identify the expenditures in an organized fashion.  Then, for each expenditure, the State must provide references to the record where the Plaintiffs may look to find the supporting documentation for each expenditure.  This "keying" requirement is supported by a number of Indian trust accounting cases where the courts required the trustee to go through the records and match expenditures to vouchers, receipts, etc. to fulfill its burden at the initial stage of the accounting process.  See, e.g., Cobell v. Norton, 428 F.3d 1070, 1077 (D.C. Cir. 2005) ("'[A] proper accounting does not consist merely of a list of transactions; rather, the trustee must provide supporting documentation that is adequate to demonstrate that each listed transaction actually took place.' This step is labeled 'verification'") (quoting Cobell v. Norton, 283 F. Supp. 2d 66, 183-84 (D.D.C. 2003));  White Mountain, 26 Cl. Ct. at 449 (noting that in Minnesota Chippewa, the defendant "was required to key expense items to vouchers and supporting documentation, including the archival materials such as authorities, workpapers, and correspondence.  These analyses were presented to the tribe, thereby enabling the tribe to form exceptions.");  Red Lake Band, 17 Cl. Ct. at 369, 372-73 (stating, "It is the Government's duty to account for those disbursements by documenting them, and where challenged, to show that they

19

were for the benefit of the Indians and were appropriated as provided for by the [statute creating

the trust]," and requiring government to reference "backup data" in the initial accounting report's

disbursement schedules) (emphasis added);  American Indians Residing on the Maricopa-Ak

Chin Reservation, 667 F.2d at 1003 (noting that trustee's accounting must include details of

transactions, with supporting documentation attached to evidence the expenditure, or, in the

alternative, references for each expenditure telling plaintiff where such documentation was

available for inspection and copying);  Sakezzie v. Utah State Indian Affairs Comm'n, 215 F.

Supp. 12, 18-19 (D. Utah 1963) (holding that State officials "have an affirmative duty . . . to

make reasonably available to the plaintiffs adequate information concerning the administration of

the trust . . . . [I]t is no answer to say that the information could be ferreted out from their records

by the plaintiffs.") (emphasis added).[10]

The decision in Red Lake Band v. United States, 17 Cl. Ct. 362 (1989), is particularly

instructive regarding what an adequate accounting contains.  In Red Lake Band, the United States

had to account (through the General Accounting Office (GAO)) for approximately

$4,000,000.00.  Although the court found that the initial 1963 GAO Report was not adequate for

accounting purposes, the court ultimately found that the government adequately accounted in the

end.  That adequate accounting was accomplished through supplementation by the government

over time, as well as the plaintiffs' work going through the record (although the court ordered

---

[10]See also Red Lake Band, 17 Cl. Ct. at 374 ("[M]uch of the plaintiff's expense in
challenging defendant's documentation or lack of it had the effect of doing defendant's
accounting work for it. . . . [M]uch of plaintiff's trial preparation time, particularly that of its
accountants, was wasted due to unnecessary challenges to documentation.  For both these
reasons, therefore, the court holds that plaintiff is entitled to be reimbursed for a portion of its
legal and other expenses . . . .").

the government to reimburse the plaintiffs for the time they spent doing what the court considered to be the government's job). Id. at 374.[11]

According to the Red Lake Band court, the 1963 GAO Report contained "disbursement analysis" that identified the trust fund through eight "disbursement schedules." 17 Cl. Ct. at 445-46. Those schedules listed, by fiscal year, "the total amount of money that the defendant asserts was expended from the Nelson Act funds for goods and services and payments to individual Chippewa." Id. at 446. The schedules had many categories of disbursements, and, according to the court, "[t]echnicians at the GAO examined several types of accounting documentation in order to place any single disbursement under one of the devised categories. This accounting documentation consisted of the agent's request for disbursing funds, vouchers, claim settlements, the agent's account current, the agent's abstract of disbursements, and the Treasurer (or GAO) Audit Certificate." Id. at 449-50.

The Red Lake Band court, in addition to describing the nature of the 1963 GAO Report, described the detail and organizational structure of the accounting report and the boxes containing supporting documentation.[12] There, the court required the defendant to provide

---

[11]The Red Lake Band court found that, "[i]n the absence of a formal accounting, the production of documents, the Gillis exceptions [in which plaintiff said there was no backup material], the defendant's responses to them, and the pretrial and trial process have had the function, in part, of an accounting to supplement the GAO report. With respect to numerous expenditures tried by sample, for instance, it was not until the final exhibit exchanges, or until trial that defendant fully accounted. . . . The court concludes that the 1963 GAO Report, enhanced by the document production [per the parties' stipulation] and the trial, constitute an accounting of the *disbursement* of the Red Lake Band's Nelson Act trust funds." 17 Cl. Ct. at 374 (emphasis in original).

[12]Apparently the documentation totaled seventy-four boxes of material (i.e., thirty-eight boxes initially (225,000 pages of material), with an additional thirty-six boxes found by the government later in the proceedings). Id. at 372-73.

"backup data" (including vouchers, invoices, bills, receipts, memoranda, or other
documents) relied upon by defendant in preparing the 1963 General Accounting
Office report . . . and listing claimed disbursements from Nelson Act proceeds for
the benefit of the Red Lake Band in the amount of $4,000,000, more or less.  Such
"backup data" shall be assembled by reference to the GAO report classifications
in the order in which the disbursements appear in the 1963 GAO report; that is,
the documents are to be grouped and labeled by appropriation fund, by year, and
by disbursement category; and, within each group of documents, the documents
are to appear in the same order as they appear on the GAO work cards from which
the 1963 report was prepared.

Id. at 371.[13]  Once the government provided backup documentation keyed to the disbursement

schedules, the court found the accounting adequate.  The court then went on to review the

plaintiff's exceptions.

The Red Lake Band opinion is also helpful because it provides an example of the detail

necessary to state an exception, and then to understand and evaluate the disbursements.  See id. at

404 (disallowed categories of expenses), 407-75 (reviewing and analyzing individual

exceptions).  The Red Lake Band court noted that it would "accept evidence other than vouchers

or claims settlements as circumstantial evidence to establish the fact of payment and adherence to

---

[13]The court in American Indians Residing on the Maricopa-Ak Chin Reservation, also
provided a good example of the detail necessary to properly account:

The form and detail appropriate to an accounting by a fiduciary is well
established.  The Commission defined the format needed to demonstrate faithful
discharge of defendant's obligations to the Indians for management of trust
properties: (a) Separate schedules should be prepared for each category of
use . . . .  (b) Each schedule should list in chronological order the leases, rights-of-
way, or other arrangements covered.  The identification number of the contract, if
any, should be shown, as well as the date, the lessee, grantee, etc., . . . and, if
defendant does not supply a copy, a reference to where the original of the contract
is available for plaintiff's inspection and copying. . . . .

667 F.2d at 1003.

regulations." Id. at 412 (emphasis in original).  In this case, the court will also consider circumstantial evidence to determine whether the State has shown by a preponderance of the evidence that the disbursement was properly spent for the stated purpose.

Understandably, the State is concerned that the requirements listed above impose significant hurdles, partly because of the volume of documentation potentially relevant to the expenditures, and partly because of the document organization (or lack thereof).  For now, the court is only requiring an accounting for FY1987 through FY1991 (see below).  And the State is working to organize the documents for those years.  So the workload should be bearable.

Although the State must make the final judgment call about what its accounting will look like, there are certain components that it must contain, as noted above.  The details of how those components are organized is ultimately the State's decision.  But certain standard elements have been consistently provided throughout the years in other Indian accounting cases, and the court expects that the State will follow suit.  Those standard elements include disbursement schedules (organized by categories identified by the State), records organized in chronological order within disbursement and document categories, and footnotes in the disbursement schedules or other type of written references tying the disbursements to the supporting documentation.

Before the State can create its disbursement categories and lists, it will no doubt have to review the contents of the document boxes from UNDC and UNDC's predecessors.  The court expects that the State will organize those boxes and cull out the irrelevant material (if any) (or err on the side of inclusion).  This seems necessary to create a disbursement list (to the extent UNDC did not).  The boxes should be descriptively labeled and numbered.  Chronological organization within disbursement categories (or vice versa) should be of paramount concern.  The organized

files within boxes should be appropriately labeled (perhaps with the year, type of document or disbursement, and box number). If an index is available, it should be provided to the Plaintiffs.

When the State creates its disbursement schedule, it may either cite to the location in boxes where supporting documentation exists (if context is necessary to understand the expense, the State should provide a brief description in the schedule) or attach a copy of the supporting documentation with proper references (for example, by listing section or page numbers of the documents). The State need not cite to everything potentially supportive of the expenditure. Rather, the State need only cite to enough documentation to meet its "preponderance of the evidence" burden. See, e.g., Minnesota Chippewa, 14 Cl. Ct. at 122 ("The *quantum* of evidence required of defendant at the two stages [accounting and rebuttal] . . . can vary.") (emphasis in original).

The court notes that an audit report is not adequate to show expenditures (although it may be part of the supporting documentation, if it is informative). Budgets alone are not adequate proof of expenditures. And the annual reports of UNDC to the State are not, in and of themselves, adequate to meet the State's burden.

At the end of the first step, the State (assuming the State produces adequate documentation) has earned (through its work in preparing an accounting report) a rebuttable presumption of correctness. White Mountain, 26 Cl. Ct. at 449 (upon adequate accounting, a presumption of regularity is created). The burden of production then shifts to the Plaintiffs. Id.

### 2.    Plaintiffs' Exceptions – What is Required?

At the second step, the Plaintiffs must establish through their exceptions either that the accounting for certain expenditures was not adequate or that specific expenditures are

24

"disallowable" because they did not satisfy the terms of the trust.  Id.  If the State has not

provided adequate documentation to support the transaction which Plaintiffs challenge through

an exception, then the court will find that the State has violated its duty to account and will

disallow that particular transaction.  (See 2001 Order at 6.)  See also White Mountain, 26 Cl. Ct.

at 449 ("As to the trustee who fails to keep proper records of his trust, it is usually stated that 'all

presumptions are against him' on his accounting, or that 'all doubts on the accounting are

resolved against him.'  G. T. Bogert, The Law of Trusts and Trustees § 962 at 20 (2d ed. 1984).

The same rule applies in Indian accounting cases.") (internal citations omitted).  Otherwise, the

burden of proof shifts back to the State to show that the disbursement was proper.  Minnesota

Chippewa, 14 Cl. Ct. at 122, 125.

　　　　As noted in the 2001 Order, "Plaintiffs' exceptions will fall into two broad categories: (1)

expenditures for which Utah has violated its duty to account (e.g. no supporting documentation,

or supporting documentation is not sufficient to show the purpose of the expenditure, etc.); and

(2) expenditures for which Utah has violated its fiduciary duty (e.g. documentation suggests that

expenditure did not benefit members of the beneficiary class, etc.)."  (2001 Order at 5.)  For the

first category, Plaintiffs do not necessarily have to provide evidence from the record to support

their exception.  But for the second category, in order to establish a prima facie case that the

exception is not allowable, Plaintiffs do have to present an explanation and evidence to back it

up.  Otherwise, the burden does not shift back to the State to finally establish propriety by a

preponderance of the evidence, and the expense will be deemed allowable.  (Id. at 6-7.)  See also

Minnesota Chippewa, 14 Cl. Ct. at 125 ("With respect to those disbursements that are on their

face improper, plaintiff may rest after pointing out such disbursements. With respect to those

disbursements that are not on their face improper, plaintiff must put on <u>sufficient evidence</u> of disallowability to shift back to defendant the burden of going forward with the evidence.") (emphasis added); <u>American Indians Residing on the Maricopa-Ak Chin Reservation</u>, 667 F.2d at 984 (plaintiffs' exceptions should not be "general and conclusory in form").

### 3.    The State's Rebuttal

At this point, the State has the last word.  Once the Plaintiffs make proper exceptions, the burden shifts back to the State to produce evidence and argument in an attempt to overcome the Plaintiffs' evidence (or the Plaintiffs' allegation that the State did not adequately account for a particular disbursement).

Once the issues have been framed, the court will analyze the exceptions and determine whether the challenged disbursements will be allowed.

### 4.    Caveat

There is one caveat.  The court is concerned that burdens may be shifted de facto by a party's failure (inadvertently or otherwise) to satisfy its burden.  Accordingly, the court imposes the following ground rules.

If the Plaintiffs contend that no adequate accounting exists for a particular disbursement, and the State, during its rebuttal, demonstrates that the information regarding the expense was reasonably ascertainable from the initial accounting report, the disbursement will be deemed allowed, whether or not it was spent in accordance with the trust.  That is, the Plaintiffs will lose the right to allege that the expenditure was not legitimate.

If the State does not adequately account for a disbursement during the first stage of the accounting process, and the Plaintiffs make an exception based on that, the disbursement will be

26

disallowed even if the State can later produce documentation from the record that sufficiently accounts for the disbursement.

Given the above rules and procedures, the parties should begin the accounting process as further outlined below.

**For What Years Must the State Account?**

If the Tenth Circuit affirms the court's April 26, 2006 order regarding res judicata (Dkt # 1043), the State will have to account for the period beginning when the trust fund received royalty income and the State began distributing such money (approximately FY1959)[14] and ending with at least FY1991, if not through the time the Complaint was filed (June 1992).[15] Regardless of the appeal outcome, the State will have to account for the period of FY1978 through FY1991 (if not through the time the Complaint was filed).  The court reaches this figure by reference to the September 8, 1977 Judgment & Decree (issued based on the parties' stipulation) in Bigman v. UNDC, Case No. 77-0031 (D. Utah 1977),[16] which provided that the

---

[14]Plaintiffs' Complaint is not clear whether it seeks an accounting for time before FY1959.  Compare Verified Compl. ¶¶ 22-23 ("Defendant has not informed the Utah Navajo Trust Fund beneficiaries how much oil was produced on [the Aneth Oil Field] from the mid 1950s through 1959.  Prior to 1959, . . . Defendant had no established, consistent or effective method to ensure compliance with the 1933 Act and Defendant delegated to others [the administration of the trust] that Defendant was reasonably required to personally or directly perform.") with Verified Compl. ¶¶ 26-29 (discussing income and expenditures for FY1959 through FY1991).

[15]Plaintiffs' Complaint is not clear whether it seeks an accounting ending FY1991 or ending at the time the Complaint was filed (June 1992).  Compare Verified Compl. ¶¶ 26-29 (discussing income and expenditures for FY1959 through FY1991) with Verified Compl. at p. 25 ¶ 1 (requesting detailed accounting of all transactions since 1933).

[16]A copy of this unreported opinion may be found in the record at Ex. 112 attached to Docket Entry Number 566.

27

defendants were required to do an accounting for the years 1971 to "the present," which at that time was September 1977.  Id. at p. 2 ¶ 3.  Because Bigman was the last accounting case in this matter, the parties will start (at a minimum) where the accounting cases left off: FY1978.

In the meantime, as a compromise and to speed up the process, the parties have agreed that the State will complete its accounting for FY1987 through FY1991.  (See Tr. of June 26, 2007 Status Conference (Dkt # 1072) at pp. 6,13-15, 17-18.)  Accounting for earlier years will be dealt with after the res judicata issue is resolved.

**Deadlines For Completion of Accounting Process**[17]

Given the relatively short number of years for which the State must account at this time, the court finds that it is reasonable to require that the **State's accounting for those years be completed by Monday, November 5, 2007**.  The court emphasizes that this will be the State's final opportunity to properly account for those years.  No supplementation will be allowed.

Once the State has submitted its final accounting, the **Plaintiffs must submit their exceptions no later than Monday, January 14, 2008.**  Because the court is requiring the State to supplement and amend its current accounting, the court strikes the Plaintiffs' earlier exceptions which were filed on June 6, 2000 (Dkt # 662), and November 22, 2000 (Dkt # 724), in response to the State's Initial, Revised, and Supplemental Accountings.  This is done without prejudice to the Plaintiffs.  If Plaintiffs so desire, they may file the same exceptions in response to the State's upcoming accounting, keeping in mind their obligation to be as specific as possible

---

[17]If either party has good cause to request an extension of any of these deadlines, it should file a motion with the court requesting an extension along with concrete reasons why the extension should be granted.

in their exceptions and to provide evidence when necessary.

**The State may then respond to the exceptions no later than Monday, February 25,**

**2008.**  At that point, the court will review the accounting, exceptions, and the State's responses

to determine which issues should be resolved in a trial or summary judgment context.

## Who Bears the Cost of the Accounting?

The State contends that the cost of the accounting should be charged to the Fund.  It cites

to Cobell v. Norton, 428 F.3d 1070 (D.C. Cir. 2005), to support its proposition.  Cobell provides

that,

> [w]here a trustee has by misconduct or negligence made a proper accounting more difficult, the trustee may be charged for the accounting's cost, and no precept of common law constrains the cost of such an accounting. . . .  Absent such misconduct or negligence, however, the costs of an accounting would fall on the trust estate itself, which, as we have said before, would automatically give private beneficiaries an incentive not to urge extravagance.

Id. at 1075 (internal citations omitted).  See also Restatement (Third) of Trusts § 38(2) (2003)

("trustee is entitled to indemnity out of the trust estate for expenses properly incurred in the

administration of the trust"); id. § 88 cmt. d ("The trustee can properly incur expenses for

reasonable counsel fees and other costs in bringing, defending, or settling litigation as

appropriate to proper administration or performance of the trustee's duties. . . .  The right of

indemnification applies even though the trustee is unsuccessful in the action, as long as the

trustee's conduct was not imprudent or otherwise in violation of a fiduciary duty."); id. § 83 cmt.

a(1) ("A trustee who fails to keep proper records is liable for any loss or expense resulting from

that failure.  A trustee's failure to maintain necessary books and records may also cause a court in

reviewing a judicial accounting to resolve doubts against the trustee.  These failure by trustees

may furnish grounds for reducing or denying compensation, . . . or for charging the trustee with the costs of corrective procedures or of having to conduct otherwise unnecessary accounting proceedings in court.").

At this point, the court need not determine who ultimately will bear the cost of the accounting. For now, the State should continue to incur reasonable expenses to conduct the accounting. After the issues in the case have been resolved, the State may apply for reimbursement from the Fund. But the Plaintiffs may also challenge the State's right to indemnification. At that point, the court will determine who bears the cost. See Bogert, et al., The Law of Trusts & Trustees § 977 (when discussing bases for court award of compensation to the trustee, the treatise provided that "the trustee asks for the compensation, typically on an accounting, and the court determines whether the amount requested is reasonable.").

### STATUTE OF LIMITATIONS, LACHES AND DAMAGES

The State has also asked the court to reconsider the March 31, 1999 Order and Memorandum Decision (Dkt # 522), in which the court dismissed the State's statute of limitations and laches defenses. Having reviewed the 1999 Order, the parties' supplemental briefs, relevant case law, the October 2003 Joint Stipulated Case Management Plan (see Dkt # 939 at 3), and the court's February 23, 2004 Order (Dkt # 948), the court has determined that additional briefing is necessary before the court resolves the statute of limitations, laches, and damages issues raised by the State. If the State wishes the court to reconsider the 1999 Order (and, of necessity, the February 2004 Order) and to consider other issues not addressed in those orders but related to statute of limitations, laches, and damages, the State must file such a

motion.

SO ORDERED this 23rd day of August, 2007.

BY THE COURT:

TENA CAMPBELL
Chief Judge