IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JAKE C. PELT, ET AL., FOR THEMSELVES AND FOR AND ON BEHALF OF A CLASS OF PERSONS consisting of all Navajo Indians residing in San Juan County, Utah, including a sub-class of persons consisting of all other Indians the Secretary of Interior saw fit to settle on lands described in the 1933 Act [47 Stat. 1418] prior to May 17, 1968,<br><br>Plaintiffs,<br><br><br>vs.<br><br><br>STATE OF UTAH,<br><br>Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br><br><br>Case No. 2:92-CV-639-TC |

Beneficiaries of the Navajo Trust Fund ("NTF" or "Trust Fund") filed this class action against the NTF trustee, Defendant State of Utah, seeking relief for alleged mismanagement of Trust Fund monies. They seek, among other things, an equitable accounting of Trust Fund income and expenditures. The equitable accounting must be completed before the court moves to the liability phase of the case.

This matter comes before the court on cross-motions for partial summary judgment regarding the scope and nature of Utah's duty to account for and invest Trust Fund income.[1]

---

[1]The motions are Plaintiffs' Motion for Partial Summary Judgment Re Utah's Duty to Account for Oil and Gas Lease Revenues (Dkt # 1074); Plaintiffs' Motion for Partial Summary

Although the parties raise many issues, the court finds that only the following two questions need to be decided at this stage of the litigation.[2]  First, what is the scope of Utah's obligation to account for the oil and gas royalties that are the source of NTF funds?  Second, what is the scope of Utah's duty to account for investment income?

For the reasons set forth below, the court holds that the 1933 statute creating Utah's trust obligations does not require Utah to routinely oversee or independently verify the federal government's collection of the oil and gas royalties that are or should be deposited into the NTF. Accordingly, Utah's income accounting need only contain documentation of income actually received and deposited into the NTF.  The court also holds that Utah's duty to account for investment income is governed by the common law prudent man standard, which was incorporated into Utah's State Money Management Act.  Further, that duty to account is limited to income received from investment of oil and gas royalties deposited in the Trust Fund before distribution to the Utah Navajo Development Council (UNDC), Utah Navajo Industries (UNI), and their affiliates.

## I. FACTUAL BACKGROUND

In 1933, Congress established the Navajo Trust Fund through legislation which imposed certain trust responsibilities on the State of Utah.  The corpus of the NTF comes from 37½ % of net royalties derived from exploitation of oil and gas deposits under the Navajo Reservation's

_____

Judgment Re Utah's Duty to Demonstrate in its Accounting that it Complied With its Duty to Invest (Dkt # 1078); and Defendant's Cross-Motion for Partial Summary Judgment Re: Utah's Duty to Invest in Fiscal Years 1987-1991 (Dkt # 1103).

[2]The other issues raised by the parties are liability issues, not yet ripe for decision. Accordingly, the court denies, without prejudice, any portion of the cross-motions not addressed in this Order.

2

Aneth Extension (the ancestral home of Navajo Indians and other Native Americans). According to the 1933 statute, the 37½ % net royalties were to be paid to the State of Utah, which was then required to spend those royalties for the health, education, and general welfare of the Indians residing in the Aneth Extension. Congress later expanded the beneficiary class to include all Navajo Indians living in San Juan County, Utah. <u>See</u> An Act to Permanently Set Aside Certain Lands In Utah As An Addition To The Navajo Reservation, And For Other Purposes, 47 Stat. 1418 (1933), <u>amended by</u> Pub. L. No. 90-306, 82 Stat. 121 (1968) (hereinafter "1933 Act"); <u>see also</u> <u>Pelt v. Utah</u>, 104 F.3d 1534, 1538-39 (10th Cir. 1996). The 1933 Act, as amended, reads in relevant part as follows:

> Should oil or gas be produced in paying quantities within the lands hereby added to the Navajo Reservation, <u>37½ per centum of the net royalties</u> accruing therefrom derived from tribal leases <u>shall be paid to the State of Utah</u>: *Provided*, <u>That said 37½ per centum of said royalties shall be expended by the State of Utah</u> for the health, education, and general welfare of the Navajo Indians residing in San Juan County.

47 Stat. 1418 (1933), as amended by 82 Stat. 121 (1968) (emphasis added).

In approximately 1959, oil and gas wells in the Aneth Extension began producing in paying quantities, and the United States Department of Interior, through oil and gas mining leases on the Navajo tribal land, began collecting oil and gas royalties. The leases were between the Navajo Nation and the producer, and were subject to approval by the Secretary of the Interior. <u>See, e.g.</u>, 25 U.S.C. § 396a (2007) (provision in 1938 Indian Mineral Leasing Act allowing tribe to lease unallotted Indian land for mining purposes, subject to Secretary of Interior approval); 25 C.F.R. Pt. 211 (Leasing of Tribal Lands for Mineral Development); <u>Coosewoon v. Meridian Oil Co.</u>, 25 F.3d 920, 927 (10th Cir. 1994) (noting that "Secretary of Interior must approve leases on

Indian lands").  (See also Ex. A to Pls.' Mem. Supp. Mot. Partial Summ. J. Re: Utah's Duty to

Account for Oil & Gas Lease Revenue (Dkt # 1075) (sample lease showing tribe as lessor and

third party as lessee).)  The State of Utah was never a party to any of the tribal leases.

The United States, as it collected the royalties, periodically sent checks to the State of

Utah for payment to the NTF.  The State, upon receipt of each check, apparently deposited it into

the Trust Fund.  According to the State, while it waited to disburse the money (some delay

between receipt and disbursement was inevitable), it invested the unused royalty funds according

to rules set forth in Utah's statutes.

In their briefing, Plaintiffs present documentation suggesting that the United States'

payments did not contain the total amount due the NTF because the federal government has

failed to properly manage and collect all royalties due from leases generating oil and gas revenue

on Indian land.  The Plaintiffs then present evidence that the State was aware of such

mismanagement and had expressed concerns over the years, both internally and to the federal

government, that the NTF was not receiving all that it was due.  Plaintiffs contend that the State,

in light of the alleged mismanagement and shortfall, had a duty to do more than deposit and

spend the royalty checks — that is, that the State had a duty to ensure collection of all royalties

due the NTF.[3]

## II. ANALYSIS

There is no dispute that Utah must account for Trust Fund income.  Instead, the parties

---

[3]The court does not make a determination about whether there was mismanagement or a shortfall of funds coming from tribal leases in the Aneth Extension.  Nor does the court make any determination about what the State knew and whether the problem continues or was corrected.  This information is provided only to create context for analysis of the issues presented.

dispute the scope of that duty to account for income.

In this long-running case, the parties' October 2003 Joint Case Management Plan identifies issues still to be resolved. The latest motions focus on two of those issues, which, the parties say, will affect the substance of Utah's ongoing accounting. Those issues, as phrased by the parties in the Joint Case Management Plan, are:

> Duty to account for income: . . . : (1) whether Utah, as trustee, must account for or verify income due the trust beyond simply acknowledging and accepting the checks received from the federal government, lessees, debtors, et al., and (2) the extent and nature of that obligation.

> [and]

> Prudent investor rule: . . . (1) whether Utah was required to comply with the "prudent investor rule," (2) the extent and nature of that obligation, if any, and (3) which party bears the burden of proof as to compliance, or lack thereof, with the prudent investor rule.

(Joint Stipulated Case Mgmt. Plan (Dkt # 939) at 4-5.)

The court will address each issue in turn, keeping in mind that Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c);  see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670  (10th Cir. 1998).

## A.     DUTY TO ACCOUNT FOR INCOME FROM OIL & GAS REVENUES

### 1.     The Parties' Positions

Plaintiffs, in their motion for partial summary judgment, contend that Utah, as trustee, "must account for or verify lease revenue due the Navajo Trust Fund ('NTF') beyond simply

acknowledging and accepting checks received from the federal government, lessees, and debtors, and if so, what that obligation entails."[4]  (Pls.' Mot. for Partial Summ. J. Re Utah's Duty to Account for Oil and Gas Lease Revenues (Dkt # 1074) [hereinafter Pls.' Mot. Re: Oil & Gas Revenue] at 1.)  They make this claim because, according to the Plaintiffs, "Utah had a duty to ensure that the NTF received all revenue to which [the NTF] was entitled under the 1933 Act, both as a function of its [common law trust] duty to take control of trust property,[[5]] and as a function of its [common law trust] duty to exercise reasonable care."  (Pls.' Mem. Supp. Mot. Re: Oil & Gas Revenue (Dkt # 1075) at 3.)   They then contend that, "to determine whether Utah has fulfilled that duty, the Beneficiaries must know, among other things, the relevant lease terms, dates of production and payment, production volume, production quality, and pricing information.  Utah's income accounting, therefore, must contain all such information."  (Id.)  To accomplish this, in the Plaintiffs' view, the State must "perform independent research and request backup documentation from the federal government as appropriate to ensure that complete and accurate revenues were being collected and transmitted to Utah on behalf of the NTF."  (Pls.' Reply Supp. Mot. Re: Oil & Gas Revenue Income (Dkt # 1109) at xxv.)  Apparently the Plaintiffs consider "independent research" to include "gain[ing] specialized knowledge with regard to oil and gas lease revenue collection" and "becom[ing] familiar with the oil and gas industry and the federal government's role within that industry."  (Pls.' Mem. Supp.

---

[4]The Plaintiffs do not clarify what they meant by "lessees and debtors."  Because the briefs focus on money from the federal government, the court similarly will limit its analysis to that.

[5]Plaintiffs apparently are referring to Restatement (Second) of Trusts § 175 (1959), which provides that "[t]he trustee is under a duty to the beneficiary to take reasonable steps to take and keep control of the trust property."

Mot. Re: Oil & Gas Revenue at 9, 17.)

The State of Utah, in opposition, contends that the 1933 Act assigns no duty to either verify or collect the net royalties derived from tribal leases on Navajo Reservation land. And, in the State's opinion, it has no "jurisdiction, permission, or authority" to do so, in part because it has never been a party to the tribal leases at issue and has no authority over the sovereign Navajo Nation. (Def.'s Opp'n Mem. (Dkt # 1102) at I-ii.) Finally, the State emphatically asserts that

> the specific issue of who, between the State of Utah and the United States government, has the duty to verify and to collect "the net royalties . . . derived from tribal leases" on Navajo Reservation land has already been litigated and decided. In Utah v. Babbitt, [53 F.3d 1145, 1151 (10th Cir. 1995),] the Tenth Circuit Court of Appeals held that the Secretary of the Interior, ***not the State of Utah***, has the duty to "oversee the collection of the proper amount from the Navajo Nation and the payment thereof to Utah."

(Id. at ii (emphasis in original).)

To determine the scope of the income accounting, the court must first address whether the State has an ongoing duty to verify and collect the royalties. By doing that, the court is not determining, at this point, whether a duty, if any, has been violated.

**2.** **The State Does Not Have an Ongoing Duty to Verify or Collect Net Royalties Due the Trust Fund.**

    **a.** **The 1933 Act**

To decide the issue, the court must first look to the 1933 Act, which established the Trust and the Trustee's attendant duties.

The Act says nothing about a duty to collect revenue. It simply says that "37½ per centum of the net royalties accruing therefrom derived from tribal leases shall be paid to the State of Utah: *Provided*, That said 37½ per centum of said royalties shall be expended by the State of

Utah for the health, education, and general welfare of the Navajo Indians residing in San Juan County."  47 Stat. 1418 (1933), as amended by 82 Stat. 121 (1968) (emphasis added).

Although not expressly stated, the clear inference from the Act's language is that the United States, not the State, is the party required to collect and pay royalties to the NTF.  In common law trust terms, the United States is the settlor.  See, e.g., Cobell v. Babbitt, 91 F. Supp. 2d 1, 50 (D.D.C. 1999) (noting that Congress was settlor of Individual Indian Money (IIM) Trust); Restatement (Third) of Trusts § 3(1) (2003) ("The person who creates a trust is the settlor.").  The legislative history is scant, but it provides some support for the proposition that the 1933 Act created separate roles and that the State is only required to manage and spend the NTF monies once they have been deposited into the Trust Fund.  See H.R. Rep. No. 1883, 72d Cong., 2d Sess. 2 (1933) ("No new policy is established [by this Act] and no outlay of money by the Federal Government is involved.  Provision is made for disposition of any revenue arising from any oil and gas which might be discovered within the area . . . .") (emphasis added); S. Rep. No. 1199, 72d Cong., 2d Sess. 2 (1933) (same).

Significantly, the Tenth Circuit has expressly ruled that the United States has a duty to collect the money that makes up the NTF.  See Utah v. Babbitt, 53 F.3d 1145, 1150-51 (10th Cir. 1995).

### b.    The Tenth Circuit Decision in Utah v. Babbitt

In Utah v. Babbitt, 53 F.3d 1145 (10th Cir. 1995), the State sued the United States Department of the Interior and the Bureau of Indian Affairs on behalf of the Trust Fund to require the United States to pay the NTF royalties derived from Chuska Energy and Navajo Nation

drilling operations within the Aneth Extension.[6]  The Navajo Nation and Chuska Energy
Company (which were intervenor-defendants) had entered into an operating agreement
concerning oil and gas drilling on land within the Aneth Extension.  They contended, along with
the United States, that the royalties were not subject to the 1933 Act's royalty-sharing provision
because the agreement was not a "lease" under the 1933 Act.

The Tenth Circuit, in addition to holding that the royalty-sharing provision of 1933 Act
did apply to the operating agreement between Chuska and the Navajo Nation, affirmed the lower
court's holding that the Secretary of Interior was responsible for the collection and payment of
royalties owed to the NTF.  In the opinion, under a heading titled "Responsibility for Collecting
and Paying Royalties to Utah," the court of appeals stated:

> The federal Defendants argue that the Secretary [of Interior] is not obligated to
> carry out this administration of royalties.  The [1933] Act is silent as to who holds
> the responsibility of royalty collection.  <u>FOGRMA [Federal Oil and Gas Royalty</u>
> <u>Management Act] provides, however, that "[t]he Secretary shall establish a</u>
> <u>comprehensive inspection, collection and fiscal and production accounting and</u>
> <u>auditing system to provide the capability to accurately determine oil and gas</u>
> <u>royalties . . . and to collect and account for such amounts in a timely manner."</u>  30
> U.S.C. § 1711(a) (West 1986).  Moreover, Congress has found that the Secretary
> "should aggressively carry out his trust responsibility in the administration of
> Indian oil and gas."  Id. § 1701(a)(4). . . .  Consequently, it was not error for the
> district court to order the Secretary to perform the administration of royalties.  We
> are not suggesting that the Secretary pay the sum due out of the governmental
> monetary sources, but that he <u>oversee the collection of the proper amount from the</u>
> <u>Navajo Nation and the payment thereof to Utah.</u>

<u>Babbitt</u>, 53 F.3d at 1150-51 (emphasis added).

The Plaintiffs downplay this language, stating that the Tenth Circuit did not decide what

---

[6]The court notes that the State's decision to sue the United States in 1992 regarding the
Chuska Energy Company operating agreement with the Navajo Nation does not create, nor is it
evidence of, a duty to verify or collect revenue.

they characterize as the precise question before this court (whether the State has an independent

duty to verify and collect[7] amounts due under the tribal leases).  Certainly the holding in Babbitt

is not dispositive.  But the Tenth Circuit's finding that the Secretary of Interior is charged with

collecting the proper amount of royalties and paying the same to Utah is certainly relevant to the

question of whether the 1933 Act limits Utah's duties to management of the funds once they

have been received from the federal government.

              c.        **The Decision in Osage Tribe of Indians of Oklahoma v. United States**

The Plaintiffs rely on Osage Tribe of Indians of Oklahoma v. United States, 68 Fed. Cl.

322 (2005), to support their position that the State is subject to the same responsibility of the

United States government to ensure all royalties due are collected and paid to the State for

deposit into the NTF.  In Osage Tribe, the court held that the

---

[7]The Plaintiffs contend that they

> have not argued that Utah should have controlled collection of lease revenues and
> administered mineral leases within the Navajo Nation, . . . controlled the oil and
> gas wells themselves or the actions of the Navajo Tribe within the Tribe's
> reservation, . . . [or] collected oil and gas lease revenues directly from producers
> within the Navajo Nation.  Instead, the Beneficiaries simply argue that as trustee
> of the NTF, Utah should have performed independent research and requested
> backup documentation from the United States as may have been appropriate to
> ensure that the federal government was collecting accurate revenues and
> transmitting a full 37½ % thereof to Utah as trustee of the NTF.

(Pls.' Reply Supp. Mot. Re: Oil & Gas Revenue at 6-7 (emphasis added).)  The Plaintiffs do not
explain what they mean by "ensure."  But in their Complaint, they seek "replenishment of the
fund for resources lost through Defendant's breaches of fiduciary duty."  (Compl. ¶ 8.)  And in
the initial memorandum supporting their motion, they contend that "Utah's income accounting
must allow the beneficiaries to determine whether Utah collected all revenue due the Trust."
(Pls.' Mem. Supp. Mot. Re: Oil & Gas Revenue at 3 (emphasis added).  See also, e.g., id. at 6-7
(citing Osage Tribe to support assertion that under the 1933 Act "Utah is directed to collect
37½ % of the revenues derived from certain tribal leases.") (emphasis added).)

> plain language of the [1906] statute [creating the trust] makes clear that [the United States'] duty is to hold in trust the moneys contractually owed ("due and . . . that may become due"), to the Tribe, not merely whatever amount is deposited by the Tribe's lessees. [The United States'] duty necessarily includes verification that the royalty paid is the amount contractually owed under the terms of the lease.

Osage Tribe, 68 Fed. Cl. at 328 (internal citation omitted).  But Osage Tribe is distinguishable for two reasons.

First, in that case, the terms of the trust are materially different from the 1933 Act's terms.  The 1906 Act at issue in Osage Tribe stated that "all funds belonging to the Osage tribe, and all moneys due [from mineral leases], and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States . . . ."  34 Stat. 539, 544 (1906) (emphasis added), quoted in Osage Tribe, 68 Fed. Cl. at 325.  Here, the 1933 Act simply says that 37½ % of the net royalties are to be paid to the State of Utah, who shall spend it for the benefit of the beneficiaries.

Second, in Osage Tribe, the United States (unlike the State here) was in a position to collect the money for the trust.  In the 1906 Act, Congress allotted land to individual enrolled members of the Osage Tribe, but reserved oil, gas, coal and other minerals to the Tribe itself.  The 1906 Act provided that "leases for all oil, gas, and other minerals . . . may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe."  34 Stat. at 543 (emphasis added), quoted in Osage Tribe, 63 Fed. Cl. at 324.

### d.    Comparison of the United States' and Utah's Duties

Contrary to the Plaintiffs' contentions in this case, the State is not in the same position as

the United States when it comes to evaluating duties under Indian trust law.  The State is not in a

position to enforce federal statutes or federal regulations, nor is it in a position to compel

production of information (much less payment of royalties) from the sovereign Navajo Nation.[8]

See 30 U.S.C. § 1732(a) (FOGRMA provision prohibiting state "inspection, auditing,

investigation, or enforcement" activities on Indian lands "except with the permission of the

Indian tribe involved," and expressly excepting royalty collection from "enforcement activities");

Utah Enabling Act, 28 Stat. 107 (1894) (providing that "Indian lands [within the State of Utah]

shall remain under the absolute jurisdiction and control of the Congress of the United States.").

Further, neither the State nor the NTF is a party to any of the tribal leases.  Given the lack of

privity, the State cannot compel payment of royalties under terms of leases between the private

mineral producers and the Navajo Nation.

The Federal Oil and Gas Royalty Management Act (FOGRMA) provides limited

remedies to a state to recover unpaid royalties.  "A State may commence a civil action under this

section against any person to recover any royalty, interest, or civil penalty which the State

believes is due, based upon credible evidence, with respect to any oil and gas lease on Federal

lands located within the State."  30 U.S.C. § 1734(a) (emphasis added).  "Federal land," as

defined in FOGRMA, does not include "Indian lands," which are separately defined.  Compare

30 U.S.C. § 1702(1) (defining "Federal land" to mean "all land and interests in land owned by

the United States which are subject to the mineral leasing laws") with 30 U.S.C. § 1702(3)

---

[8]The Navajo Nation is a party to the tribal leases, which are subject to Secretary of
Interior approval.  But, as the Tenth Circuit has observed, the Navajo Nation "could choose to
not allow oil and gas production on its lands and thus cut off the trust fund's source of
revenue . . . ."  Pelt v. Utah, 104 F.3d 1534, 1545 n.11 (10th Cir. 1996).

(defining "Indian lands" to mean "any lands or interest in lands of an Indian tribe . . . held in trust by the United States . . . including mineral resources and mineral estates reserved to an Indian Tribe").  Similarly, although FOGRMA allows for Secretary of Interior delegation to a state for, among other things, inspecting, auditing, investigating, and issuing demands for royalty management enforcement purposes, such delegation is limited to Federal land within the state. 30 U.S.C. § 1735(a).  Accordingly, the State's royalty collection remedies under FOGRMA only extend to non-Indian land.

Methods of verification are also limited to royalties from non-Indian land, with one exception.  The Secretary of Interior may enter into a cooperative agreement with a state concerning royalty management activities (other than collection of royalties) on Indian lands, but only with the Indian tribe's permission.  30 U.S.C. § 1732(a).  Because the State cannot compel the tribe to approve such an agreement, it would be unreasonable to impose a regular duty on the State to verify royalties due the Trust Fund when the State's ability to do so is not guaranteed.[9]

Finally, contrary to the Plaintiffs' assertion, the State is not a co-trustee with the United States.[10]  A co-trustee is defined as "[o]ne of two or more persons in whom the administration of a trust is vested."  Black's Law Dictionary (8th ed. 2004).  Co-trustees (also known as joint trustees), have joint responsibility for all aspects of the trust.  Id.; Restatement (Second) of Trusts

---

[9]Further, to the extent the Plaintiffs try to argue that they only seek an order requiring the State to verify total income due the Trust Fund on a regular basis, such gathering of information without any duty to enforce collection of the proper amount of royalties would be a futile exercise.  The Plaintiffs' request for verification goes hand in hand with its position that the State of Utah has the duty to "ensure" payment of royalties (i.e., collect royalties), presumably through litigation compelling payment from the United States.

[10](See Pls.' Mem. Supp. Mot. Re: Oil & Gas Revenue at 8.)

13

§ 194 (1959).  See also Mason & Dixon Lines, Inc. v. Glover, 975 F.2d 1298, 1303 (7th Cir.

1992) ("Under law of trusts, the exercise of joint powers requires the action of all trustees.").  If

the United States were a co-trustee, it too would be subject to the same spending duties imposed

on the State by the 1933 Act.  But that is not what Congress intended when it enacted the 1933

Act (as is clear from the language of the Act and its legislative history), nor is it what has

occurred over the years.  Rather, the United States is the settlor of the NTF.

       The court finds that the 1933 Act creates distinct, rather than overlapping, responsibilities

for the United States and for the State of Utah.  The federal government collects the income due

the NTF and sends it to Utah for deposit into the NTF.  Utah manages the trust monies once they

are received from the United States government.[11]

> Although far from being clearly drafted, we can ascertain that [under the 1933 Act] there was property to be transferred from the United States government to Utah (the 37½% of royalties) . . . .  Congress chose to reserve a portion of any oil and gas revenues.  Congress then transferred the ownership interest in these proceeds to the State of Utah to hold as trustee for the benefit of the Aneth Extension Navajos.

Pelt v. Utah, 104 F.3d 1534, 1543, 1545 (10th Cir. 1996) (emphasis added).  In other words, the

State's continuing duty to take control of trust property[12] begins the moment the monies are

received.

---

[11]"FOGRMA. . .  was enacted in order to 'fulfill the trust responsibility of the United States for the administration of Indian oil and gas resources,' 30 U.S.C. § 1702 . . . .  The United States has a general fiduciary obligation to Indians with respect to management of oil and gas leases on Indian land. . . . The scope and extent of this fiduciary relationship is defined in part by FOGRMA and the regulations promulgated thereunder."  Coosewoon v. Meridian Oil Co., 25 F.3d 920, 928-29 (10th Cir. 1994) (emphasis added).

[12]See Restatement (Second) of Trusts § 175 (1959) ("The trustee is under a duty to the beneficiary to take reasonable steps to take and keep control of the trust property.").

### 3.      Scope of the Revenue Accounting

Because the State of Utah does not have an ongoing duty to verify or collect royalties due

the NTF, the scope of its revenue accounting is limited to income actually received.

### 4.      Plaintiffs' Claims of Liability

Although the Plaintiffs address the scope of Utah's income accounting duties in their

motion, they intertwine their accounting arguments with claims of liability for failure to fulfill a

substantive duty under the Trust.  The Plaintiffs acknowledge that they introduced documents

addressing the federal government's responsibilities to collect royalties,

> not as evidence of Utah's express duties under the 1933 Act, but as evidence that
> Utah knew or should have known that the federal government was continually
> failing to fulfill its duty to verify and collect oil and gas lease revenues on federal
> and Indian lands, and thus, as part of Utah's duties to collect [Navajo Trust Fund]
> property and to exercise reasonable care, Utah as trustee with actual knowledge
> should have acted to protect the NTF from the consequences of the federal
> government's failure.

(Pls.' Reply Mem. Supp. Mot. Partial Summ. J. Re: Oil & Gas Revenue (Dkt # 1109) at xii

(emphasis added).)  As indicated in the language quoted above, the Plaintiffs cite to two common

law trust duties to support their argument. First, they rely on the duty to take control of trust

property.  Second, they rely on the trustee's duty to exercise reasonable care.

To the extent the duty advocated by the Plaintiffs (that "Utah as trustee with actual

knowledge should have acted to protect the NTF from the consequences of the federal

government's failure") actually exists, it does not derive from the duty to take control of trust

property.  What remains is Plaintiffs' argument that such a duty arises out of the State's duty to

exercise reasonable care.  But the court declines to address this issue now because it is not tied to

the accounting.  Rather, it is an issue that should be addressed during the liability phase of these

proceedings.  Accordingly, the court defers ruling on that portion of the questions raised by the

parties.

**B.     DUTY TO ACCOUNT FOR INCOME FROM INVESTMENTS**

    **1.     The Parties' Positions**

    The parties have filed cross-motions for partial summary judgment seeking a ruling on

which standard governs the duty to invest and the scope of the duty to account for investment

income.

    According to the Plaintiffs, the main issue is

    whether Defendant Utah, as trustee, must demonstrate in its accounting that it
    complied with its duty to maximize income of the Navajo Trust Fund ("NTF")
    according to the federal standards for investment of Indian trust funds, or in the
    alternative, whether Utah must demonstrate in its accounting that it at least
    complied with the common law trust investment standards of the Prudent Man
    Rule, or lastly, the Prudent Investor Rule.

(Pls.' Mot. Partial Summ. J. re: Utah's Duty to Demonstrate in Acctg. that it Complied With

Duty to Invest [hereinafter Pls.' Mot. Re: Duty to Invest] at 1-2.)  Plaintiffs present a layer of

issues.

    First, they assert that Utah stands in the shoes of the United States as trustee of the NTF

and so it must be held to federal standards governing the United States' administration of Indian

trust funds.[13]  According to Plaintiffs, the federal standards require, generally speaking, that

investments be designed to maximize trust income.  That maximization, they contend, is reached

through compliance with specific investment rules set forth in federal statutes.

─────────────────

    [13]Plaintiffs present alternative standards as well, but their principal argument is that
federal statutes govern investment of the Trust Fund's income.

Second, they assert that Utah has the burden to show, through its income accounting, that Utah complied with those specific rules (that is, that Utah complied with its duty to invest).

The State, on the other hand, advocates application of the investment standard set forth in the 1974 State Money Management Act, Utah Code Ann. §§ 51-7-1 et seq.  The State also contends that its duty to invest stops with "Surplus Royalty Funds," which it defines as "funds that are available for investment while awaiting expenditure."  (Def.'s Mem. Opp'n Pls.' Mot. Re: Duty to Invest at v.)  And the State further argues that the definition of "investment" does not include either economic development loans Utah made to UNDC and its affiliates or investments made by UNDC and its affiliates such as UNI.  According to the State, those transactions should be documented, if at all, in the expense segment of the accounting.

## 2. The 1933 Act and the Standard Governing Investment of Trust Funds

The 1933 Act is silent on the issue of the duty to invest, and, consequently, it is silent on the duty to account for investment income.  It simply says:

> Should oil or gas be produced in paying quantities within the lands hereby added to the Navajo Reservation, 37½ per centum of the net royalties accruing therefrom derived from tribal leases shall be paid to the State of Utah: *Provided*, That said 37½ per centum of said royalties shall be expended by the State of Utah for the health, education, and general welfare of the Navajo Indians residing in San Juan County.

47 Stat. 1418 (1933), as amended by 82 Stat. 121 (1968) (emphasis added).[14]

---

[14]The State contends that its interpretation of the 1933 Act is entitled to substantial judicial deference under Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  The court has already determined that application of such deference is not appropriate in this matter.  (See Aug. 23, 2007 Order (Dkt # 1073) at 14 n.7 ("The court disagrees with the State's assertion that it is entitled to the same deference courts apply to federal agencies' statutory interpretations.  No special deference is owed the State in its interpretation of the 1933 Act or 1968 Act.").)

The Plaintiffs contend that the State was required to comply with specific federal statutes governing the United States' investment of Indian trust funds, of which maximization of investment yield is a central principle.  The court disagrees.

First, in an earlier order addressing the burdens and procedures governing the State's accounting for expenditures, the court noted that common law trust rules provide the default rules that will fill gaps left by the 1933 Act.

> While the 1933 Act does, as a general matter, govern the trust relationship between the parties, the court finds that the 1933 Act does not address the specific burdens and procedures currently at issue before the court.  The silence of the 1933 Act on specific accounting procedures simply reinforces the notion that traditional trust principles regarding accounting—derived from the Indian accounting cases and more generally from the common law of trusts—should be applied, insofar as these principles do not contradict the express language of the 1933 Act. . . . [W]hen Congress establishes a trust relationship, the courts should infer, <u>unless the statute directs otherwise</u>, that the trust relationship will be <u>governed by the common law of trusts</u>.

(Aug. 23, 2007 Order (Dkt # 1073) (quoting July 18, 2001 Order (Dkt # 792) (quotation marks omitted) (emphasis added).)

Second, the Plaintiffs unpersuasively contend that the State sits directly in the shoes of the federal government and so is subject to the statutory rules set forth in 25 U.S.C. §§ 151-166. But those federal statutory provisions expressly apply only to funds held in trust by the United States.  For example, one of those provisions addresses investment of tribal funds held on the books of  the Department of Treasury and states that

> [a]ll funds held in trust by the United States and carried in principal accounts on the books of the United States Treasury to the credit of Indian tribes shall be invested by the Secretary of the Treasury, at the request of the Secretary of the Interior, in public debt securities [etc.].

25 U.S.C. § 161a(a).  A similar provision reads:

All tribal funds arising under section 155 of this title on June 13, 1930, included in the fund "Indian Money, Proceeds of Labor," shall, on and after July 1, 1930, be carried on the books of the Treasury Department in separate accounts for the respective tribes, and all such funds with account balances exceeding $500 shall bear simple interest at the rate of 4 per centum per annum from July 1, 1930.

25 U.S.C. § 161b.

There is no indication in the federal statutory scheme or the 1933 Act that the State of Utah was required to follow those rules (or that the State would even anticipate that those specific rules applied to it). Consequently, the State is not required to follow the federal statutory scheme requiring the trustee to invest funds to "maximize" the return on investment.

Instead, given the silence of the 1933 Act, the court holds that, generally speaking, principles articulated in the common law of trusts in effect at the time of the investments should govern Utah's duty to invest. In this case, the common law prudent man rule is the governing standard, which has been expressed in both case law and statute.[15] See, e.g., Restatement (Second) of Trusts § 227 (setting forth prudent man rule as of 1959); see also Restatement (Third) of Trusts Pt. 6 Ch. 17 Introductory Note ("The foundation of trust investment law in the First and Second Restatements [of Trusts] has been the so-called 'prudent man rule' of Harvard College v. Amory, 9 Pick. (26 Mass.) 446, 461 (1830).").

The time period relevant here begins approximately September 1977 (the date of the Bigman v. UNDC Judgment and Decree) and ends when the complaint was filed in this case in 1992. Currently, the State is preparing an accounting for the period of FY1987-FY1991. (Aug.

---

[15]The Plaintiffs suggest that, in the alternative, the "prudent investor" rule should apply. Because that rule replaced the Restatement (Second) of Trusts prudent man rule in 1992 (after the time period relevant here), the court declines to adopt it for this case.

23, 2007 Order & Mem. Dec. (Dkt # 1073) at 28.)  But in the August 23, 2007 Order, the court

stated that, at a minimum, "the State will have to account for the period of FY1978 through

FY1991 (if not through the time the Complaint was filed)."  (Id. at 27.)  Accordingly, the court

will analyze the issue of applicable investment standards based on the understanding that the

State's investment income accounting must eventually be completed (and evaluated) for the

period of FY1978-FY1991.[16]

    To determine the contours of the common law prudent man rule, the court will look to the

Restatement of Trusts.   See Cobell v. Norton, 240 F.3d 1081, 1099 (D.C. Cir. 2001) ("Much as

the Supreme Court has regularly turned to the Restatement [of Trusts] and other authorities to

construe trust responsibilities, it is appropriate for the district court to consult similar sources.").

According to the Restatement (Second) of Trusts, the section entitled "Investments Which a

Trustee Can Properly Make" set forth the "prudent man" rule and provided as follows:

> In making investments of trust funds the trustee is under a duty to the beneficiary
> . . . in the absence of provisions in the terms of the trust or of a statute otherwise
> providing, to make such investments and only such investments as a prudent man
> would make of his own property having in view the preservation of the estate and
> the amount and regularity of the income to be derived . . . .

Restatement (Second) of Trusts § 227 (1959) (emphasis added).

    The court finds that Utah's 1974 State Money Management Act codified the prudent man

rule.[17]  See Utah Code Ann. § 51-7-14 (1974) ("Prudent Man Rule for Management of

---

    [16]If the Tenth Circuit Court of Appeals affirms this court's ruling on the res judicata issue
(see Apr. 26, 2006 Am. Order & Mem. Dec. (Dkt # 1043) (currently on interlocutory appeal)),
the time period may extend as far back as 1959.

    [17]Indeed, the official comment to § 227 notes that "[i]n many States this rule has now
been adopted by statute."  Restatement (Second) of Trusts § 227 Cmt (1959).  See also George
Gleason Bogert et al., Bogert's Trusts & Trustees § 613 (discussing "Prudent Person Statutes"

Investments").  In 1974, that rule read as follows:

> Selection of investments as authorized by [Utah Code] Sections 51-7-11, 51-7-12, and 51-7-13 shall be made with the exercise of that degree of judgment and care, under circumstances then prevailing, which men of prudence, discretion, and intelligence exercise in the management of their own affairs, not for speculation but for investment, considering the probable safety of their capital, as well as the probable benefits to be derived and the probable duration for which such investments may be made, and considering the investment objectives specified in Section 51-7-17.

Utah Code Ann. § 51-7-14(1) (1974).  The above-quoted rule remained in place through at least 1992, when this suit was filed.  See 2003 Utah Laws Ch. 163 (amending above-quoted version of § 51-7-14(1) that had been enacted in – and unchanged since – 1974).

In 1974, the responsibility for investment of NTF funds was in the hands of the Indian Affairs Board, rather than the State Treasurer (the State's default money manager):

> Unless otherwise required by the Utah Constitution or applicable federal law, the functions, powers and duties [of state agencies] relating to the deposit, investment, or reinvestment [etc.] are transferred to and shall be exercised by the state treasurer, except . . . Funds assigned to the board of Indian affairs pursuant to section 63-36-3 . . . .

Utah Code Ann. § 51-7-4 (1974) (emphasis added).  At that point, the NTF funds were subject to the following investment standard:

> Funds which will not be used within one year from the date they become available to the board shall be invested in United States government bonds or securities, or bonds or securities of the state of Utah at the highest rate that may be available at the time, provided that the bonds or securities shall be redeemable not more than five years after the date of their issuance.

Utah Code Ann. § 63-36-3 (1967).  This investment standard was not tied to the 1974 State

---

and noting that "[b]y 1981, a form of the prudent person rule had been adopted by statute in 35 states [including Utah]").

Money Management Act.  But in 1978, the above-quoted investment standard was replaced with

statutory language providing that the NTF funds "not allocated for use by the Board of Indian

Affairs <u>shall</u> be invested in accord with [State Money Management Act] Section 51-7-11."  Utah

Code Ann. § 63-36-3.5 (1978) (emphasis added).  In 1978, the responsibility for investing the

funds still lay with the Board of Indian Affairs (although the responsibility would later be

transferred to the State Treasurer).

The language in Section 63-36-3.5 (quoted above) seems straightforward until it is

compared to the language of Section 51-7-11, which provides that "[a]ll public funds, <u>other than</u>

<u>. . . funds of the Board of Indian Affairs</u>, . . . may be deposited or invested only in such of the

following as meet the criteria of section 51-7-17: [listing types of investment]."  Utah Code Ann.

§ 51-7-11(1) (1978) (emphasis added).  If the phrase "funds of the Board of Indian Affairs"

includes the NTF funds (a reasonable interpretation), then the two sections contradict each other.

Resolution of this apparent discrepancy is important because the State Money Management Act's

prudent man rule only applied to investments made under Sections 51-7-11, 51-7-12, and 57-11-

13.[18]

The court views the conflicting language as a drafting oversight.  Section 63-36-3.5 was

enacted in 1978, four years after Section 51-7-11 became part of the Utah Code.  Before 1978,

the exception in Section 51-7-11(1) made sense because the NTF funds were subject to a

different investment standard (that is, the standard set forth in the 1967 version of Section 63-36-

_____

[18]Of course, even if investments made by the Board of Indian Affairs were outside the
bounds of Section 51-7-11 during the years 1978 to 1984 (when the exception was removed), the
investments still might satisfy the prudent man rule as a matter of fact.

3).  But in 1978, the exception in Section 51-7-11(1) became superfluous.  It appears that the exception in Section 51-7-11 was mistakenly left in the section when the Utah State Legislature enacted Section 63-36-3.5 in 1978.  Because the language of Section 63-36-3.5 affirmatively establishes the State Legislature's intent to impose the investment standards of Section 51-7-11 on the NTF funds, the court finds the exception in Section 51-7-11 to be a remnant of earlier statutory investment rules.[19]

In 1984, the discrepancy was resolved.  In that year, the State Money Management Act was amended to place responsibility for investing the NTF money with the State Treasurer.[20]  See 1984 State Money Management Act Amendments, Utah Sen. B. No. 88 (Jan. 27, 1984) at Section 4 (amending Utah Code Ann. § 51-7-4 (1953) to remove exception for NTF funds held by the Board of Indian Affairs).  The 1984 Amendments also added the NTF funds to the list of funds that must be deposited or invested only according to the criteria set forth in Utah Code

---

[19]An attempt to interpret the language in a manner that resolved apparent inconsistencies was not fruitful.  First, it is clear from the State's submissions to the court that investment responsibility was not transferred to the State Treasurer until 1984 (an earlier transfer of responsibility would have mooted any apparent drafting discrepancy).  (See Def.'s Supplemental Mem. Opp'n to Pls.' Mot. for Partial Summ. J. re: Duty to Invest (Dkt # 1136).)  Second, there is nothing to indicate that "funds of the Board of Indian Affairs" did not include the NTF funds.  Third, interpreting the exception to mean that Section 51-7-11 investment criteria were optional for the Board of Indian Affairs directly contradicts the mandatory language of Section 63-36-3.5 ("shall be invested in accord with Section 51-7-11").

[20]In an earlier order, the court asked the State of Utah to answer a question regarding the transfer of investment responsibilities from the Utah Board of Indian Affairs to the State Treasurer.  (See Feb. 13, 2008 Order (Dkt # 1130).)  The State responded and included a Supplemental Declaration of Utah State Treasurer Edward Alter.  (See Dkt # 1135.)  The Plaintiffs then responded to the State's answer to the court's question.  (See Dkt # 1139.)  They also filed a Motion to Strike Portions of Mr. Alter's supplemental declaration.  (See Dkt # 1140.)  The court has reviewed all of those submissions.  Because the court does not rely on Mr. Alter's supplemental declaration to decide the matter before it, Plaintiff's Motion to Strike is DENIED AS MOOT.

Ann. § 51-7-12.  Id. at Section 11.  Further, any investment made according to Section 51-7-12 was required to comply with the State Money Management Act's "Prudent Man Rule."  (See also Alter Decl. ¶¶ 8, 15 (noting that he has been responsible for investing surplus portions of Trust Fund and that all such investments were made in accordance with "prudent man" rule of Utah Code § 51-7-14).)[21]  The above-cited provisions governed investment of the NTF funds for the remainder of the relevant time period.

In Pelt v. Utah, 104 F.3d 1534 (10th Cir. 1996), the Tenth Circuit emphasized that the "discretionary trust [created by the 1933 Act] provides the [State of Utah] with great latitude in its decision-making processes."  Id. at 1544.  This court finds that one of those decision-making processes included the decision to set up investment rules for the NTF funds.  Accordingly, the court finds that the State, in its discretion, reasonably and properly codified its investment duties as a trustee of the NTF, intending to apply a workable version of the common law prudent man rule.

Because those investment rules incorporated the common law prudent man standard,[22] the court finds that the State Money Management Act provides proper investment guidelines for

---

[21]The court, however, does not view Mr. Alter's statement and opinion in Paragraph 15 of his Declaration to constitute evidence that the State did in fact comply with the State Money Management Act or the State's fiduciary duties.

[22]Compare Restatement (Second) of Trusts § 227 (requiring trustee "to make such investments and only such investments as a prudent man would make of his own property having in view the preservation of the estate and the amount and regularity of the income to be derived") with Utah Code § 51-7-14 (1984) (requiring investment to "be made with the exercise of that degree of judgment and care, under circumstances then prevailing, which men of prudence, discretion, and intelligence exercise in the management of their own affairs, not for speculation but for investment, considering the probable safety of their capital, as well as the probable benefits to be derived and the probable duration for which such investments may be made . . . .").

investment of the NTF funds from 1978-1992.  See also Restatement (Second) of Trusts § 227

(1959) (providing that common law rules apply only in absence of statute codifying investment

rules).  Consequently, compliance with the State Money Management Act for the years 1978-

1992 (if demonstrated through an income accounting) will be sufficient evidence that the State's

investments of NTF funds are entitled to the presumption of correctness noted in the court's June

19, 2001 Order (Dkt # 778) at page 7 (quoting White Mountain Apache Tribe of Arizona v.

United States, 26 Cl. Ct. 446 449 (1992)).  That is not to say that the court is now determining

whether the investments actually complied with the State's fiduciary duties or the requirements

of the State Money Management Act.  But the court finds that compliance with the State Money

Management Act will satisfy the State of Utah's investment duties under the 1933 Act absent

exceptions from the Plaintiffs that rebut that presumption of correctness.

At this point, the State has already invested the money as it saw fit.  So the question of

whether such investment satisfied the State's trust duty is a matter for the liability phase of this

case.

### 3.   Scope of "Investment" For Purposes of Accounting

The State asks the court to hold that its duty to invest does not extend to loans to UNDC

and the UNI companies or to income that UNDC or the UNI companies may have received from

the investment of money in their possession.  Consistent with that, the State contends that the

only funds that need to be invested and accounted for are the Surplus Royalty Funds they define

in their brief as "funds that are available for investment while awaiting expenditure."  (Def.'s

Mem. Opp'n Pls.' Mot. Re: Duty to Invest at v.)  The court agrees.

The 1933 Act provides that:

> Should oil or gas be produced in paying quantities within the lands hereby added to the Navajo Reservation, 37½ per centum of the net royalties accruing therefrom derived from tribal leases shall be paid to the State of Utah: *Provided*, That said 37½ per centum of said royalties <u>shall be expended by the State of Utah</u> for the health, education, and general welfare of the Navajo Indians residing in San Juan County.

47 Stat. 1418 (1933), as amended by 82 Stat. 121 (1968) (emphasis added). The 1933 Act says nothing about investment duties. It focuses on the State's spending role. Under the 1933 Act, the State's primary goal is to spend the money as it comes in from the federal government, as opposed to, for example, other trusts where the purpose of the trust is to maintain the trust corpus and increase it through investment. Of course, the State reasonably recognized that because there would be some delay between receiving the royalty income and disbursement of that income based on spending plans, the State must invest that money.

But once the money is spent (for example, through an economic development loan to UNI), it is no longer "income" subject to the State's investment duties and it is no longer part of the Trust Fund corpus. Further, the State reasonably categorized loans as expenditures fashioned to promote "the health, education, and general welfare of the Navajo Indians residing in San Juan County" under the 1933 Act. (Whether these transactions actually fulfilled the trustee's duties is an issue for another day.) Consequently, the State does not need to account for the loans to UNDC or its affiliates on the income side of the equation. It will, however, be required to account for such loans on the expense side of the equation. And then those expenditures will be subject to exceptions by Plaintiffs. If exceptions are filed, the court will evaluate them under the same standard that any other expenditure is evaluated.

As for income that UNDC or the UNI companies may have received from the

investment of money in their possession, the State, to some extent, is not required to account for that investment income and will not be held accountable for any failure to invest that income according to the trustee's investment duties outlined above.  What the State must do, however, is account for its expenditures to UNDC and the UNI Companies, and to the extent the money disbursed to those entities was subsequently invested by those entities, the State must provide documentation of such investment in the expense accounting (at least to the point that the funds are no longer traceable because they were commingled with non-trust sources of income).  At the liability phase, the court will not apply the investment standard to such investment income; rather, it will apply the standard governing expenses.

### 4. Income Accounting Burdens

Plaintiffs inaccurately contend that the State "bears the burden to show *in its accounting* that it complied with the applicable investment standards required for the [Navajo Trust Fund]." (Pls.' Mem. Supp. Mot. Re: Duty to Invest at 5 (emphasis in original).)  Consistent with what the court has held concerning burdens for expense accounting, the court holds that the State bears the burden to account for investment income by showing what was invested, how it was invested, and the result of the investment.[23]  The burden then shifts to the Plaintiffs to make exceptions articulating why they contend the State failed to satisfy its duty to invest.  The State may then respond to the exception in any manner it sees fit to protect itself from a finding that the trust

---

[23]The income accounting must provide Plaintiffs with information that will make it "readily ascertainable" to determine whether the State has satisfied its trustee duty.  But, contrary to Plaintiffs' assertion, the law does not require the State to spell out its compliance or to provide the information in a format that would be intelligible to those untrained in finances or investment.

duty was violated.  In other words, the same burdens and procedures applicable to the expense accounting will apply to the income accounting. (See Aug. 23, 2007 Order (Dkt # 1073); July 5, 2006 Order (Dkt # 1056); June 19, 2001 Order (Dkt # 778).)

## **ORDER**

For the foregoing reasons, the court orders as follows:

1.      Plaintiffs' Motion for Partial Summary Judgment Re Utah's Duty to Account for Oil and Gas Lease Revenues (Dkt # 1074) is DENIED.

2.      Plaintiffs' Motion for Partial Summary Judgment Re Utah's Duty to Demonstrate in its Accounting that it Complied With its Duty to Invest (Dkt # 1078) is GRANTED IN PART AND DENIED IN PART.

3.      Defendant's Cross-Motion for Partial Summary Judgment Re: Utah's Duty to Invest in Fiscal Years 1987-1991 (Dkt # 1103) is GRANTED IN PART AND DENIED IN PART.

4.      Plaintiffs' Motion to Strike Portions of Declaration of Edward T. Alter (Dkt # 1140) is DENIED AS MOOT.

DATED this 14th day of March, 2008.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge